ADAMS, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CASE NO. 4:01CR441 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge John R. Adams |
| | ) | |
| ERIC S. BOWKER | ) | ORDER |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter came before the Court upon its own initiative to set in place the terms of a Defendant Eric Bowker's supervised release. The Court held a hearing on the matter on April 13, 2010. Bowker, was present at the hearing, represented by counsel, and also afforded the opportunity to speak on his own behalf. Furthermore, during the hearing, the Court received recommended terms of release from the U.S. Probation Office. Based upon the facts in the record and introduced during the hearing and the argument of the parties, the Court hereby imposes the following terms of supervised release.

**I.    BACKGROUND**

The Sixth Circuit summarized the underlying facts of Bowker's conviction as follows.

In March, 2000, Tina Knight began working as a part-time general assignment reporter at WKBN Television in Youngstown, Ohio. WKBN has a general email account for most employees, and in June, 2000, WKBN received a number of emails relating to Knight. The emails were sent from several different email addresses and purported to be from an individual variously identified as "User x," Eric Neubauer, Karen Walters, and "BB." Several of the emails attached photographs with verbal captions. One caption referred to Knight being shot with a pellet gun, and another email said, "Thanks for my daily Tina Knight fix. Thanks for helping me get my nuts off," and another said "More Tina Knight, that is what I

want and need." After receiving approximately nine of these types of email, WKBN's news director took them to the station's general manager. They then contacted Special Agent Deane Hassman of the FBI. Soon thereafter, Knight was shown the emails, and she was stunned and frightened.

FBI Agent Hassman began investigating the Tina Knight emails in July, 2000. Hassman was concerned about Knight's personal safety based on the content of the emails. One of the emails that concerned Hassman stated, "I'm not the type of obsessed viewer that hides in the bushes near your home to watch you come home from work, but we shall see. That may actually be fun." Another disturbing email stated, in part, "Dear Ms. Knight. Now I'm really pissed that you were looking even cuter than normally. You fucked up a little bit and here I am watching on this black and white thrift store TV. Cute, cute, cute. I bet you were a Ho at Ohio University in Athens, doing chicks and everything. Wow."

On July 25, 2000, Hassman sent emails to the various email addresses on the correspondence pertaining to Knight. Hassman asked the sender of the emails to contact him so that he could determine the sender's intent. Within 24 to 48 hours, Hassman received a telephone call from an individual who identified himself as Erik Bowker. Hassman wanted to set up a meeting with Bowker so Hassman could positively identify the sender of the emails and also ask him to cease and desist from contacting Knight. They arranged to meet at the public library in Youngstown, but Bowker never showed.

A few weeks later, Knight began receiving hand-written notes at WKBN, the majority of which were signed by "Doug Wagner." By September, the letters were arriving at the station almost every couple of days. One of the letters included the phrase, "All this week I will be playing the role of Doug Wagner." A letter dated August 9, 2000 was signed "Chad Felton"; stated, "I think you are a super babe"; and included a necklace. The return addresses on the letters were one of two P.O. Boxes registered to Erik Bowker or his mother.

Knight left her employment at WKBN in November, 2000 to take a position at WOWK CBS13 in Charleston, West Virginia. WKBN did not inform the general public of Knight's new location.

In late December, 2000, Knight's parents, who reside in Medina, Ohio, received a card and a handwritten note at their home. The card purported to be from "Kathryn Harris." The letter read, "Dear Tina Knight: I am Kathryn Harris today. I didn't want your parents asking you a lot of questions, nor did I want to attract a lot of attention to you. My letters to you are all online at yahoo.com in a standard mail account. It is all explained there so please check in and read what I have written.... The E-mail address is tinahatesme@yahoo.com." Agent Hassman visited the email address to check if any letters had been sent to the email address mentioned in the letter. Hassman discovered that an email had been sent December 25, 2000. At the

end of the email, the name "Doug Wagner" was typed. The email read, in part, "I told you I would not contact you by mail anymore but I am sorry, I am in agony. I'm thinking about you all the time. You really are my dream girl.... I am blinded with affection for you. I did not ask for this. Nope, it's all your fault.... Please don't cat dance on my emotions by failing to respond to me at all."

In February, 2001, Bowker filed a lawsuit against Knight in the Mahoning County Common Pleas Court. Knight's social security number was stated in the complaint, which was served at Knight's home address in West Virginia. Bowker's lawsuit accused Knight of stalking him. Agent Hassman attended a status conference for the lawsuit on March 16, 2001, so that he could make face-to-face contact with Bowker. After meeting Bowker at the hearing and confirming that Bowker had been sending the unsolicited correspondence to Knight, Hassman told Bowker that the correspondence was unwelcome and might be a violation of federal law. Hassman advised Bowker that if the conduct continued, it might result in his arrest. Bowker responded that he had a First Amendment right to engage in that type of conduct. Nevertheless, during the meeting, Bowker wrote and signed a note stating, "I understand that Tina M. Knight wishes all further contact with her or any family member to stop and I agree to do so, pursuant to conversation with Deane Hassman, special agent, Federal Bureau of Investigation ...." Bowker also agreed to voluntarily dismiss his lawsuit against Knight.

Despite Bowker's March, 16, 2001 agreement to cease and desist from any further contact with Knight, on that very same day, Bowker mailed a letter to Knight. Bowker also continued to attempt telephone contact with Knight. Between January 26 and August 29, 2001, Bowker made 146 telephone calls from his cell phone to WOWK CBS 13, where Knight worked. Bowker also made 16 calls to Knight's personal residential telephone in West Virginia between August 11 and 28, 2001. Knight's number was unlisted and unpublished. According to telephone records, each of the 16 calls placed to Knight's home were preceded by *67, which enables a caller to block identification of his telephone number on the recipient's caller identification display. Bowker also called Knight's co-worker and a neighbor.

As the telephone calls to Knight's television station persisted through the summer of 2001, Agent Hassman believed it was important to capture Bowker's voice on tape, so Hassman provided Knight with a recording device at the television station. On June 12, 2001, Knight recorded a 45 minute telephone call from Bowker who, at one point, identified himself as "Mike." During the conversation, Bowker referred to Knight's neighbors, her family members and her social security number. He also indicated he might be watching Knight with his binoculars. Knight provided the tape to the FBI and never spoke to Bowker again on the telephone.

On July 16, 2001, Knight received a letter at the television station. In the letter, Bowker referred to Knight's parents and stated several times, "You do not hang up on me." The letter also crassly referred to Knight's car, threatened to file a

mechanic's lien on her car and her co-worker's car, accused Knight and her colleague of being "fuck-ups, assholes and seriously emotional and mentally unbalanced," and contained numerous sexual references. The letter stated that Bowker would be contacting Knight's neighbors, pointed out that Knight had not registered her car in West Virginia, and concluded with the words, "So bye-by, fuck you, you are an asshole and a sociopath and an embarrassment to mothers everywhere sir.... Adios, Eric.... Smooch, Smooch."

On August 10, 2001, Knight received a certified letter mailed to her residence in West Virginia. Accompanying the letter were numerous photographs of Bowker at various locations in West Virginia, Knight's home state. The letter stated, in part, "Send me an E-Mail address. It keeps me long distance, you know what I mean." Knight forwarded the letter and the photographs to the FBI. Bowker's credit card statement later revealed purchases from a Kmart and a Kroger near Knight's place of employment and residence in West Virginia between June 12 and July 30, 2001.

In August 2001, Bowker left a series of messages on Knight's answering machine asking that Knight or Knight's friend call him back, which did not occur. Among other things, Bowker stated:

I don't even know why I'm nice to you ever at all, you and your fucked-up friend should not even be working in the media. You know you gotta mother-fucking realize there's like 50 percent men in this country and you better mother-fucking learn that you're going to have to deal with us sometime....

Well, it looks like nobody is going to answer me if Tina Knight is okay, so I'm gonna take the 1:00 a.m. bus out of Columbus, Ohio and come down there and see for myself. Okay, I'll be there about 6:00 a.m. Bye.

Knight testified that these messages made her afraid to leave the house everyday, and she feared that Bowker might try to rape her. She gave the answering machine recordings to the FBI.

Bowker was arrested on August 29, 2001 at a self-storage facility in Youngstown where he kept some of his possessions. Among other things recovered from the storage facility, Bowker's car and other locations, were a police scanner set to the frequency of the Youngstown Police Department, a paper with scanner frequencies from the Dunbar, West Virginia Police Department, letters bearing the name "Chad Felton," a credit report for Tina Knight, Knight's birth certificate, a map of Dunbar, West Virginia, Greyhound bus schedules with West Virginia routes, and photos taken by Bowker during a West Virginia trip on July 11, 2001, which included pictures of Knight's place of work, her car and CBS news trucks. The FBI also discovered that Bowker had in his possession a Discover Card credit card bill addressed to Tina Knight in West Virginia. Knight never received that statement in the mail.

*United States v. Bowker*, 372 F.3d 365, 371-74 (6th Cir. 2004) overruled on other grounds. Based upon the above facts, Bowker was convicted of one count of interstate stalking, in violation of 18 U.S.C. § 2261A(1); one count of cyberstalking, in violation of 18U.S.C. § 2261A(2); one count of theft of mail, in violation of 18 U.S.C. § 1708; and one count of telephone harassment, in violation of 47 U.S.C. § 223(a)(1)(C). On September 10, 2002, Bowker was sentenced to 96 months' incarceration followed by three years of supervised release.

Unfortunately, Bowker's incarceration did very little to discourage his activities. During his incarceration, Bowker attempted on numerous occasions to send letters to his stalking victim. One letter read "Thinking about our friendship warms my heart." Doc. 264-19. Bowker then attempted to send Knight another letter on January 11, 2007. In that letter, Bowker makes certain to mention Knight's parents by name and one of her friends by name. Doc. 264-20. On January 22, 2007, Bowker attempted to send a letter to general counsel for a media company that employed Knight, requesting that the counsel deliver certain items to Knight. Doc. 264-21. In November of 2007, Bowker again addressed a letter to this counsel, enclosing a birthday card for Knight and asking that it be delivered to her. Doc. 264-23. In the card, Bowker had handwritten "32 years of happiness," "blue cakes for Tina," and "I think that Tina is pretty and real cool. My favorite newslady." The last two sentences were written around three hand-drawn hearts. Doc. 264-23 at 6. On another occasion, Bowker sent a letter that appears to be dated November of 2007. In that letter, Bowker requests a picture of Knight so he "can show every one how pretty [his] dreamgirl is." Doc. 264-24. Finally, Bowker attempted to send another letter in April of 2008. In that letter, Bowker again mentions Knight's mother by name, encourage Knight to send her flowers. Doc. 264-26.

Knight was not the only individual harassed during Bowker's incarceration. A co-worker

of Knight's, April Kaull, also received a letter from Bowker. Doc. 264-26. Likewise, Bowker sent a Valentine's Day card to Judge Cynthia Rice. Judge Rice was an assistant U.S. Attorney that minimally participated in Bowker's original conviction.

Bowker served the full 96 months of his sentence. During that time, he accrued no good time credits due to his repeated violations of the rules and regulations of the Bureau of Prisons. Shortly prior to his release, the Government moved to modify the terms of Bowker's supervised release. Thereafter, this Court held a series of hearing. Ultimately, the Court put in place numerous conditions through orders issued on March 13, 2009 (Doc. 225) and March 27, 2009 (Doc. 245). Within a month of his release, Bowker had violated the terms of his release. Among his violations, Bowker had filed a lawsuit against the victim of his stalking, despite a court order that he not attempt to contact her. As a result, his supervised release was revoked and he was ordered incarcerated for one year.

The Court had been hopeful that Bowker would receive mental health treatment during his incarceration. For that matter, Bowker expressly requested certain placement in the Bureau of Prisons to facilitate his treatment. Instead, Bowker refused any and all mental health treatment during his incarceration. He now is scheduled for release on April 16, 2010, and this Court must again impose conditions for his supervised release.

## II. LEGAL STANDARD

The statute governing modification of the terms of supervised release, 18 U.S.C. § 3583(e)(2), provides in relevant part that this Court:

> may modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation and the provisions applicable to the initial setting of the terms and conditions of post-release supervision[.]

The Sixth Circuit has found that conditions of supervised release are appropriate if they are "reasonably related to the dual goals of probation, the rehabilitation of the defendant and the protection of the public[.]"  *United States v. Bortels*, 962 F.2d 558, 560 (6th Cir. 1992). Furthermore, under 18 U.S.C. § 3583(d), this Court may impose a non-mandatory special condition of supervised release if it determines that the condition is reasonably related to several sentencing factors. These factors are:

> the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care or other vocational treatment in the most effective manner.

18 U.S.C. § 3553(a)(1), (a)(2)(B)-(D).   The condition also must "involve [] no greater deprivation of liberty than is reasonably necessary for" several sentencing purposes; "afford adequate deterrence to criminal conduct; ... to protect the public from further crimes of the defendant; and ... provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(B)-(D).  Finally, the condition must be "consistent with any pertinent policy statements issued by the Sentencing Commission." 18 U.S.C. § 3583(d)(3).

### III. ANALYSIS

1. <u>Prohibition on filing civil actions</u>

Bowker is hereby prohibited from filing any civil or administrative action against any individual or entity without leave of this Court.  This includes, but is not limited to, federal and state courts and administrative agencies.

The Court finds no merit in Bowker's objections to this condition.  In his objections,

Bowker contends that this Court's complete ban on civil filings violates his right to access to Courts. Such a ban on filing, however, has been expressly approved by the Sixth Circuit. In that respect, this Circuit has approved enjoining vexatious and harassing litigants by requiring them to obtain leave of court before submitting additional filings. *See Filipas v. Lemons*, 835 F.2d 1145 (6th Cir. 1987); *Wrenn v. Vanderbilt Univ. Hosp.*, Nos. 94-5453, 94-5593, 1995 WL 111480 (6th Cir. Mar. 15, 1995)(authorizing a court to enjoin harassing litigation under its inherent authority and the All Writs Act, 28 U.S.C. § 1651(a) (citations omitted)).

A ban for the duration of Bowker's supervised release is particularly appropriate. The Court takes judicial notice of the fact that Bowker has filed 12 civil actions in this district. Moreover, Bowker filed four civil actions in the Middle District of Florida, another 15 civil suits in the Middle District of Pennsylvania, 2 civil actions in the Northern District of Georgia, and three actions in the Southern District of West Virginia. These suits in large part overlap, claiming injuries from prison officials and F.B.I. agents. Furthermore, these suits have largely resulted in the same outcome: dismissal of the complaint.

In addition to the fact that Bowker has been a vexatious litigant, the Court makes special note of the fact that Bowker's prior supervised release violation included the fact that he had attempted to file a civil action against his stalking victim. Accordingly, in order to protect the public and rehabilitate Bowker, his civil case filings must be curtailed.

Finally, the Court notes that the effect of this term of release is minimal. Bowker was previously declared a vexatious litigator by a colleague on this Court. *See Bowker v. Bakeman*, Case. No. 1:09CV846, Doc. 2. In so ruling, my colleague prohibited Bowker from filing any new civil actions, while permitting him to file actions in any pending criminal matter or appeal. As such, this Court's prohibition on filing civil actions has very little, if any, practical effect.

Nevertheless, the facts and law support imposition of such a prohibition.

2. Placement in a halfway house

Upon his release, Bowker shall reside at Parkside Male Residential Hotel, 1431 S. Main St., Akron, OH 44311. Bowker shall reside at this facility until this Court approves an alternative residence. This transitional housing arranged by the U.S. Pretrial Services and Probation Department will be paid for a period of up to 90 days or until Bowker can financially pay for the cost of housing.

During the hearing, Bowker expressed no objection to this housing arrangement. The Court, therefore, imposes this condition.

3. Mail box restrictions

Bowker shall not own, use, or have access to the services of any commercial mail agency, nor shall he open maintain a post office box without the prior approval of the probation officer.

During the hearing, Bowker objected to this condition, asserting that it was more restrictive than necessary. However, Bowker was unable to provide an alternative for monitoring his use of the mail system. Unfortunately, Bowker has time and again used the mail system to harass his victims and others that were involved in his prosecution. These attempts continued for more than seven years after his conviction. Accordingly, the Court finds it necessary to place some restrictions on Bowker's ability to send and receive packages and mail.

Furthermore, the Court notes that Bowker is still free to use the U.S mail service. He is simply prohibited from obtaining a P.O. Box that would allow him to more easily receive packages. Moreover, he is prohibited from using a commercial mail service that would likewise permit him to receive packages without knowledge of the probation department. Accordingly, this condition is properly imposed to protect the public and assist in rehabilitating Bowker.

4. <u>Geographic restriction</u>

Bowker is hereby restricted to Summit County, Ohio during the beginning period of his supervised release.  Bowker may not travel outside of this county without prior approval of the probation officer.

Initially, the Court notes that Bowker expressed concern that he would be unable to visit his mother because of this restriction.  While defense counsel asserted that Bowker's mother had claimed a hardship in travelling to Summit County, the Court notes that she has previously made such a trip without a problem.  Regardless, the Court notes that the above restriction permits travel outside the county with permission from the probation officer.  Accordingly, Bowker could still visit his mother.  He would simply need to make a specific request to his probation officer prior to doing so.

Bowker also argued that such a travel restriction is more restrictive than necessary.  The Court disagrees.  First, the Court is aware of the current residency of the victim and finds that prohibiting Bowker from leaving Summit County is necessary to continue to protect the victim. While defense counsel asserted that his client had repeatedly expressed a desire to move on with his life, Bowker himself again demonstrated that he had not moved on.  When questioned about his motives for filing civil suits as recently as 2009, Bowker once again asserted that he was trying to convince the victim of his crimes to admit that she had committed perjury.  As such, it is clear that Bowker is still fixated on the victim and others associated with his prosecution.

To that extent, Bowker again reiterated that Judge Cynthia Westcott Rice had been assisting him following his conviction.  From what the Court can ascertain, Judge Rice was an assistant U.S. attorney that briefly participated in Bowker's prosecution.  Other than Bowker's own statements, there is nothing to suggest that Rice ever assisted Bowker in any manner.

Moreover, the record contains a somewhat disturbing "Valentine" card that Bowker sent to Judge Rice. In the letter, Bowker suggests that he and Judge Rice should run off together to a tropical island after Judge Rice leaves her husband. As Judge Rice presides in a county adjacent to Summit County, the Court believes that it is necessary to restrict Bowker's travel to Summit County. Bowker's objection to this condition is overruled.

5. Telephone carrier

Bowker shall provide his probation officer with the name of any long-distance carrier that he contracts with following his release.

6. Search and seizure

Bowker shall submit his person, residence, place of business, computer, and/or vehicle to a warrantless search conducted and controlled by the U.S. Pretrial Services and Probation Office at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Any computer found is subject to seizure and/or search. Failure to submit to this condition may be grounds for revocation. Bowker shall inform any other residents of his residence that it may be subject to a search pursuant to this condition.

While Bowker objected to this condition, it is beyond challenge that the U.S. Supreme Court has acknowledged the lesser privacy rights of those on probation and approved of the above-described standard for searching a probationer. Accordingly, the objection is overruled.

7. Financial disclosure and restrictions

Bowker shall provide the probation officer with access to any financial information and will sign any release required for periodic credit checks. Furthermore, Bowker shall not incur any new credit charges or open any additional lines of credit without the approval of the probation officer.

Bowker again lodged a general objection to this condition. Bowker first contends that his underlying conviction and history demonstrate that he has never engaged in a financial crime. However, at the same time, this Court has no other mechanism for determining whether Bowker is in compliance with the terms of his release. Without the ability to control Bowker's credit applications and review his credit history, this Court could never know with certainty whether Bowker had obtained contraband such as a computer. Furthermore, random credit checks and electronic monitoring are minimally intrusive to Bowker's liberty. As such checks will protect the public and encourage Bowker to comply with his remaining terms of release, his objections are overruled.

8. <u>Location monitoring program</u>

Bowker shall participate in the Location Monitoring Program for a period of 6 months. The Court, however, acknowledges Bowker's argument that he should not be subject to home confinement. Accordingly, Bowker's movements during his residency at Parkside will not be limited. Bowker shall consent to be monitored by the form of location monitoring indicated below and shall abide by all of the requirements established by the pretrial services and probation office related to the use of this location monitoring technology. Bowker shall pay the costs of participation in the location monitoring program, based on his ability to pay as determined by the pretrial services and probation officer.

Bowker shall be monitored by the form of location monitoring indicated below, which shall be utilized for purposes of verifying compliance with any court-imposed condition of supervision:

- Location monitoring technology at the discretion of the officer
- Radio Frequency (RF) Monitoring

>   -       Passive GPS Monitoring
>
>   **XXX**     Active GPS Monitoring (including hybrid GPS)
>
>   -       Voice Recognition

Bowker is also expressly prohibited from entering any public library or the campus of Akron University. Both locations have significant numbers of unmonitored computers. Accordingly, to protect the public, Bowker may not visit those locations.

Bowker has also argued that is improper to use location monitoring in any manner. The Court disagrees.

First, other courts have expressly approved of the use of location monitoring. *See United States v. Porter*, 555 F.Supp.2d 341 (E.D.N.Y. 2008). Furthermore, the use of such technology is particularly appropriate herein. Bowker was convicted of interstate stalking. There is no doubt that his initial harassment caused the victim to leave the state of Ohio and relocate to West Virginia. She provided no notice of her move and did not publicize her new location. Bowker, however, tracked her down and crossed state lines to continue his harassment. Bowker crossed state lines and continued to monitor the victim without her knowledge of his travels. The Court, therefore, finds that location monitoring is necessary to protect the public. Moreover, while it may restrict Bowker's liberty somewhat, it is much less restrictive than more severe limitations on his ability to move throughout Summit County.

9. <u>Random drug testing</u>

Bowker shall submit to random drug and alcohol testing as specified by the pretrial services and probation officer. Bowker has expressed no objection to this condition of release.

10. <u>Mental health aftercare</u>

Bowker shall participate in an outpatient mental health treatment plan with Summit

Psychological Associates.  Initially, Bowker shall be required to attend treatment on a weekly basis.  Bowker's treating physician shall determine the scope of his treatment.

Bowker objected to a proposed condition that required treatment for sexual deviancy, but otherwise agreed that mental health treatment was appropriate.  This Court finds it appropriate to permit the scope of Bowker's mental health treatment to be determined by a mental health professional.  To the extent that Bowker takes issue with a determination by that professional, he may bring such objection to this Court.

11. Polygraph

Bowker shall submit to periodic polygraph testing as directed by his probation officer.  No violation proceedings will arise solely on the results of any polygraph examination or valid Fifth Amendment refusal to answer a polygraph testing.

Bowker objects to the use of the polygraph because of its alleged suspect scientific validity and its affect on his constitutional rights. The Court finds no merit in this objection.

First, the Court notes that this supervised released condition is limited.  Bowker maintains fully his Fifth Amendment right to refuse to answer questions.  Moreover, "failing" the polygraph does not give rise to a violation.  As such, any argument about the appropriate weight to be given to the results may be cast aside.  Instead, the polygraph will provide one more tool to the probation department to assess Bowker's compliance with other provisions.  Given Bowker's track record of discipline in the prison system and his repeated displays of disrespect for authority figures, to protect the public the Court must put in place some mechanism for judging Bowker's honesty with his probation officer.  Given that the polygraph may simply lead to further investigation and that Bowker is required to be honest with his probation officer regardless of any test, the Court finds that the periodic use of such a test is minimally intrusive to Bowker's liberty

rights.

12. <u>No contact list</u>

Bowker is hereby prohibited from conducting any research pertaining to any person on the following list:

- Court staff of the United States District Court for the Northern District of Ohio
- Assistant U.S. Attorney Ronald Bakeman and all other U.S. Attorney staff
- All staff of the U.S. Pretrial Services and Probation Office
- All staff of any treatment or service agency which provides him services
- All staff at the residential facility that will house him.

The above individuals, however, may be contacted for official business purposes. Contacting the above persons for reasons outside of official business shall be deemed a violation.

Bowker is also prohibited from both researching and contacting the following individuals:

- Tina Knight
- Ron Knight
- Maria Knight
- Edward F. Feran
- Judge Cynthia Rice
- Jennifer Clark
- Matthew Cain

Bowker has apparently objected to the above condition, but he has supplied little reasoning for his objection. Regardless, the Court finds the above prohibitions to be appropriate.

Bowker has a demonstrated propensity for latching on to individuals once they become involved in his life. While the victim, Tina Knight, presents the most egregious example of this

conduct, Bowker's conduct has not been so limited.  As described above, Bowker has sent what could effectively be called love letters to Judge Rice, who was an Assistant U.S. Attorney only minimally involved in Bowker's case.  It was also brought to the Court's attention during Bowker's prior revocation hearing that he had begun sending letters a female caseworker at his halfway house during his last period of supervised release.  As such, the Court finds it necessary to restrict Bowker's contact with those that have been involved in his prior proceedings.

These restrictions necessarily include the following:  the victim and her family, Tina, Ron, and Maria Knight; the former prosecuting attorneys, Edward Feran and Judge Rice; attorneys that have defended the government in numerous civil suits filed by Bowker, Jennifer Clark and Matthew Cain; this Court's staff; the current prosecuting attorney, Ronald Bakeman, and his staff; the staff of pretrial and probation; and the staff of the facilities that Bowker will encounter during his supervised release.

This condition serves two purposes. First, it continues to protect the public from Bowker. Second and more importantly, it serves to rehabilitate Bowker.  The Court is hopeful that such restrictions will force Bowker to look forward rather than backward.  The time has come for Bowker to stop attempting to relitigate his decade-old conviction and attempt to become a productive member of society.  Unfortunately, Bowker's past and present actions have strongly indicated that he is not ready to move forward and still seeks to convince his victim to admit that she committed perjury.  Accordingly, these contact restrictions will be enforced to help Bowker move forward with his life.

13. <u>Prohibition on Computer Use</u>

Initially, the Court notes that Bowker is foreclosed from challenging this condition of his terms of supervised release.  The internet restriction was placed upon Defendant in his amended

judgment of conviction, filed on August 4, 2005.   The judgment states that Defendant "is ordered to follow any special conditions as directed by U.S. Probation Office, including to refrain from any internet access."  Accordingly, a proper challenge to that condition should have been raised on direct appeal from that order.  See *U.S. v. Sutton*, 91 Fed. Appx. 268 (4th Cir. 2004); *U.S. v. Raymer*, 148 Fed. Appx. 555 (7th Cir. 2005).  As no challenge to the internet restriction was raised, Bowker is foreclosed from challenging that restriction now.

Even if this Court were to consider Bowker's challenge to the internet restriction, the Court would find no merit to his argument.   The Court is cognizant that a ban on internet usage imposes a significant hardship on a defendant.  In reaching its decision on this matter, the Court has carefully reviewed case law surrounding this issue.   The Seventh Circuit detailed prior precedent on this issue.

> In *United States v. Scott*, 316 F.3d 733 (7th Cir. 2003), this court decided that a total ban on access to Internet services, imposed without advance notice to the defendant, was impermissible given the open-ended and standardless nature of the delegation of power to the probation officer. *Id.* at 736.  That case was remanded so that the district court could consider a more narrowly tailored and precisely articulated set of rules. *Id.* at 737.  A similar approach is warranted here. We find it notable that this court's concerns in *Scott* are reflected in the decisions of our sister circuits, which have also declined to uphold a total ban on Internet access by defendants convicted of receiving child pornography without at least some evidence of the defendant's own outbound use of the Internet to initiate and facilitate victimization of children. Compare *United States v. Paul*, 274 F.3d 155, 169 (5th Cir. 2001) (upholding Internet prohibition where defendant had used Internet communication to encourage exploitation of children by providing other pedophiles with advice on how to gain access to child victims); *United States v. Crandon*, 173 F.3d 122, 127-28 (3d Cir. 1999) (upholding post-release ban on Internet use where defendant convicted of receiving child pornography had also engaged in sexual relations with an underage girl he had met via electronic mail), with *United States v. Freeman*, 316 F.3d 386, 391-92 (3d Cir. 2003) (vacating absolute Internet prohibition in absence of evidence that defendant had used Internet to contact children); *United States v. Sofsky*, 287 F.3d 122, 126-27 (2d Cir. 2002) (vacating and remanding strict Internet prohibition where defendant pleaded guilty to only receipt of child pornography); *United States v. White*, 244 F.3d 1199, 1205 (10th Cir. 2001) (finding ban on all Internet and computer use to be "greater

than necessary" to serve goals of supervised release where defendant had been convicted only of possession of child pornography).

*U.S. v. Holm*, 326 F.3d 872, 878 (7th Cir. 2003).   The Court finds upon review that an initial ban on internet usage during the beginning of Bowker's supervised release is appropriate.

Similar to the defendants in *Crandon* and *Paul*, Bowker used the internet himself to reach out and harass the victim.   Furthermore, the record reflects that Bowker no doubt used the internet to gather information about the victim, such as her phone number and address.   Like the condition approved of in *Paul*, this Court's condition is limited in duration and the Court has acknowledged that it will revisit the issue once Bowker has demonstrated some compliance with the remaining terms of his release.   Furthermore, Bowker's use of the internet could be described in a manner similar to the description used for the defendant in *Paul*.   "Paul was a predator who roamed the internet in search of prey[.]"   *U.S. v. Voelker*, 489 F.3d 139, 149 (3rd Cir. 2007).   While Paul also attempted to assist other engage in his illegal activities, the Court does not find that fact to alter its decision.   In this matter, Bowker used the internet to track his victim across state lines and attempted to coerce her into using the internet to avoid face-to-face confrontation.   Additionally, during these proceedings, Bowker has repeatedly professed that while he has no desire to harm the victim, he wants her "to tell the truth."   This fact was repeated as recently as the hearing in this matter on April 13, 2010.

In addition to those comments, Bowker has routinely harassed the Government attorneys that were involved in his prosecution.   It remains clear that Bowker harbors significant animosity towards those involved in his original trial.   Despite a lack of internet access during his incarceration, Bowker was able to locate one of those former Government attorneys and send her a "Valentine's Day Card" as recently as this past February.   As such, there is little doubt in the

Court's mind that Bowker will in some manner attempt to locate those previously involved in his trial.  A complete restriction on internet use is the only manner in which to restrict Bowker's ability to rapidly locate readily available public information.  While this restriction may indeed impose a hardship on Defendant, it is a hardship that arises from Bowker's systematic prior use of the internet for illegal purposes.

Finally, the Court is mindful that there may be occasions on which accessing the internet is necessary.  Accordingly, Defendant is permitted to access the internet after receiving written approval from his probation officer.  The probation officer may monitor that internet usage in any manner deemed appropriate to ensure that it is being used only for a proper purpose.  Furthermore, as the Court indicated during the hearing, Bowker will have a limited availability to use a computer owned by the U.S. Pretrial Services and Probation Office.  Bowker must request the use of this computer in advance. If Bowker deems that the time he is able to use the computer is insufficient, he must file a motion with this Court providing specific details on why he needs the use of the computer for a longer period of time.

IT IS SO ORDERED.

April 16, 2010                                           /s/ John R. Adams
Date                                                          Judge John R. Adams
                                                                      United States District Court